**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GLEN BOOTAY,** | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) 2:09-cv-1241 |
| | ) |
| **KBR, INC.; KELLOGG, BROWN &** | ) |
| **ROOT SERVICES, INC.; KBR** | ) |
| **TECHNICAL SERVICES, INC.;** | ) |
| **OVERSEAS ADMINISTRATION** | |
| **SERVICES, LTD.; and SERVICES** | |
| **EMPLOYEES INTERNATIONAL, INC.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Pending before the Court are the MOTION OF KBR, INC., OVERSEAS

ADMINISTRATION SERVICES, LTD., AND SERVICE EMPLOYEES INTERNATIONAL,

INC. TO DISMISS AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

(Document No. 33) and the MOTION OF KELLOGG BROWN & ROOT SERVICES, INC.

AND KBR TECHNICAL SERVICES, INC. TO DISMISS PLAINTIFF'S AMENDED

COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) (Document No.

35). Plaintiff has filed responses in opposition to the motions and they have been thoroughly

briefed by all parties (Document Nos. 34, 36, 40, 42, 44, 45, 48, 49, 53, 56, 57). In addition, both

parties have submitted numerous exhibits for consideration by the Court. On July 20, 2010, the

Court heard oral argument on the motions and provided both parties with the opportunity to

further supplement the record. The motions are now ripe for disposition.

<u>Factual Background</u>

Plaintiff was an Army sergeant on active military duty during the Iraq war and was assigned by the Army to perform a mission at the Qarmat Ali water treatment facility in Iraq for four days in April 2003. This case was filed in 2009 and arises out of the serious health conditions suffered by Plaintiff, allegedly due to his exposure to sodium dichromate during the days he spent at Qarmat Ali. The sodium dichromate was apparently spread by members of the Iraqi Baath party in an effort to sabotage the facility. Sodium dichromate is quickly uptaken and then disposed of by the human body, such that tests are able to confirm the presence of the substance only if they are administered within weeks of the exposure. Amended Complaint ¶ 72. Bootay was in good health when he enlisted in the Army on September 12, 2001 and he received an honorable discharge in September 2003. Subsequently, Bootay has experienced severe health symptoms that have resulted in his use of a walker and disability at the age of thirty-one. Bootay's theory of the case, in essence, is that Defendants knew or should have known about the danger posed to him by exposure to sodium dichromate such that they had a duty to warn him and to protect him from that danger. Instead, Bootay alleges that Defendants concealed, misrepresented, or delayed in reporting the facts relating to the sodium dichromate exposure at Qarmat Ali, which caused Bootay to lose the opportunity to be tested to confirm whether or not he had been exposed to sodium dichromate. Sergeant Bootay has rendered patriotic service to the nation and is a sympathetic Plaintiff.

The five Defendants are related corporate entities (collectively "KBR"). Kellogg Brown & Root Services, Inc. ("KBRSI"), the operating corporation, received a contract from the United States Army under the Logistics Civil Augmentation Program ("LOGCAP") to provide logistical

support services to the military forces operating in Iraq during the Gulf War. One of the projects assigned to KBR was to resume the pumping of water from the Qarmat Ali facility into Iraqi oil fields to help Restore the Iraqi Oil industry (referred to as the "RIO Contract") as quickly as possible after the invasion. KBR, Inc. is the ultimate parent corporation. The remaining Defendants are alleged to be subcontractors and/or affiliates on the project.

On March 26, 2010, the Court issued a Memorandum Opinion and Order which granted the motion to dismiss the original Complaint for lack of personal jurisdiction filed by three of the five named Defendants, KBR, Inc., Overseas Administration Services, Ltd. ("Overseas"), and Service Employees International, Inc. ("SEII") (collectively the "Jurisdictional Movants"). In the same Opinion, the Court granted the motion to dismiss for failure to state a claim filed by the remaining Defendants, KBRSI and KBR Technical Services, Inc. ("KBR Technical"), because the allegations of the original Complaint were insufficient to toll the statute of limitations. The Court permitted Plaintiff to file an Amended Complaint. Plaintiff filed his Amended Complaint on April 9, 2010 and Defendants have renewed their motions to dismiss, alleging lack of personal jurisdiction and failure to state a cognizable claim.


Motion to Dismiss Amended Complaint for Lack of Personal Jurisdiction

Two of the Defendants, KBRSI, the entity that entered into the RIO Contract, and KBR Technical, have conceded that personal jurisdiction is proper in this Court. Each of the Jurisdictional Movants has submitted an affidavit which asserts that it is not registered to do business in Pennsylvania, that it maintains no office, facilities, mailing address or employees in Pennsylvania, and that it does not conduct, direct or solicit any business in Pennsylvania.

In granting the original motion to dismiss for lack of personal jurisdiction, the Court

explained that "specific" jurisdiction did not apply because all of the operative events occurred in

Iraq. Plaintiff does not challenge this conclusion. The Court also observed Plaintiff had fallen

far short of showing the type of "continuous and systematic" contacts with Pennsylvania that

would be necessary for the exercise of "general" jurisdiction.

The Amended Complaint, ¶ 10, contains numerous new averments in an effort to

establish jurisdiction. The averments largely consist of pure legal conclusions (*see, e.g.,*

Amended Complaint ¶ 10(e), (h), (m)), and/or recite the activities of separate and distinct KBR

entities.[1] For example, Plaintiff alleges in Amended Complaint ¶¶ 10(ee) and 30 that the same

individuals serve as common officers and directors of KBRSI, KBR Technical, and KBR

Holdings, LLC – none of which are the Jurisdictional Movants in this case. It is fundamental that

each Defendant has a due process right to challenge the Court's exercise of jurisdiction. Plaintiff

has the burden to demonstrate that the exercise of jurisdiction over each Defendant is proper.

*General Electric Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). Plaintiff may not, as a

general matter, use the contacts of one Defendant to establish personal jurisdiction over a

separate and distinct Defendant. Indeed, Plaintiff does not contest the lack of contacts between

each of the Jurisdictional Movants and Pennsylvania. Instead, Plaintiff seeks to establish

personal jurisdiction by asking the Court to "pierce the corporate veil" and to consider the

Pennsylvania contacts of all of the related KBR entities as alter egos.

After the Jurisdictional Movants renewed their jurisdictional challenge to the Amended

---

[1]Similarly, the Amended Complaint conflates the doctrines of forum non conveniens and personal jurisdiction. *See* Amended Complaint ¶ 10(l) (averring that jurisdiction is proper in this Court because it is the most convenient forum due to Sergeant Bootay's illness).

Complaint, Plaintiff filed a Motion for Jurisdictional Discovery to explore the veil piercing/alter ego theory. On May 21, 2010, the Court denied Plaintiff's "unspecific request" to take discovery because counsel had failed to: (1) explain what discovery would be done; (2) demonstrate why such discovery would be warranted; and (3) address how such discovery would overcome the jurisdictional flaws identified in the Court's Memorandum Opinion. Plaintiff did not attempt to remedy the deficiencies in the request for discovery that were identified by the Court.

The well-established test for the exercise of general jurisdiction is whether a defendant has "continuous and systematic contacts" within the forum. *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2007); *see also Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408 (1984). The Court incorporates its discussion of the underlying jurisdictional principles set forth in its original Memorandum Opinion and concludes that the Amended Complaint again falls far short of alleging the type of "continuous and systematic contacts" that could support the exercise of "general jurisdiction" over the Jurisdictional Movants.

The separate existence of corporate entities **is** generally respected for jurisdictional purposes, and the activities of one entity are imputed to another only if Plaintiff establishes that they should be regarded as alter egos. *See Eldon v. Brown,* 2010 WL 415317 (D.N.J. 2010) (citations omitted). Whether the corporate veil should be pierced such that separate corporations are viewed as alter egos is a question of state law. *Star Creations Inv. Co. v. Alan Amron Devp., Inc.*, 1995 WL 495126 *12 (E.D. Pa. 1995). Pennsylvania law imposes a difficult standard for piercing the corporate veil. In *Kiehl v. Action Mfg. Co.*, 535 A.2d 571, 574 (Pa. 1987) the Pennsylvania Supreme Court emphasized that under Pennsylvania law, "courts will disregard the corporate entity only in limited circumstances when used to defeat public convenience, justify

wrong, protect fraud or defend crime."

KBRSI and KBR Technical are separate and distinct corporate entities, neither of which has challenged this Court's exercise of personal jurisdiction. There is no evidence of a disregard of corporate formalities by the various KBR entities. To the contrary, Plaintiff alleges the <u>over-use</u> of corporate formalities, by emphasizing repeatedly that Overseas and SEII were "shell companies" with no business or assets of their own, which were set up in the Cayman Islands to avoid United States taxes.[2] The fact that corporate entities file separate tax returns weighs <u>against</u> piercing the corporate veil. *See Northeastern Power Co. v. Balcke-Durr, Inc.,* 49 F.Supp.2d 783, 790 (E.D. Pa. 1999). Plaintiff has failed to show sufficient control and/or coordination to apply the alter ego doctrine under the facts and circumstances of this case. The testimony submitted by Plaintiff that was given by KBR employees Mark Lowes and Greg Badgett in other cases misses the point. KBRSI's control over the RIO <u>project</u> is distinguishable from the control over a corporate <u>entity</u> that must be shown to trigger the veil piercing/alter ego doctrine. At most, the Amended Complaint avers that Overseas and SEII recruited workers in Pennsylvania and provided workers that were directed by KBRSI on the RIO Contract. As to KBR, Inc., the only alleged basis for jurisdiction is that it is the ultimate parent corporation, has profited from contracts in Pennsylvania, and proclaims itself to be a "world leader." Plaintiff's showing falls far short of the Pennsylvania standard for piercing the corporate veil. The Jurisdictional Movants are not registered to do business in Pennsylvania, they do not maintain an office, facilities, mailing address or employees in Pennsylvania, they do not conduct, direct or

_____

[2]Assuming, arguendo, the truth of these averments, the Court doubts that Plaintiff would be able to establish liability against Overseas or SEII or that Plaintiff would benefit by obtaining a judgment against entities with no assets.

solicit any business in Pennsylvania and they are not the alter egos of other KBR entities.  In sum, it is abundantly clear that none of the Jurisdictional Movants have had continuous and systematic contacts with Pennsylvania that would support the exercise of general jurisdiction.

The Court notes that its determination is fully consistent with the results reached in *McManaway v. KBR*, 695 F. Supp.2d 883 (S.D. Ind. 2010) (dismissing Qarmat Ali claims by Indiana National Guard soldiers against the same KBR Defendants for lack of personal jurisdiction), *Bixby v. KBR*, 2010 WL 1499455 (D. Or. April 12, 2010) (concluding that there was no "general jurisdiction" over the KBR Defendants but exercising specific jurisdiction), *Billiter v. KBR*, 2010 WL 2901618 (N.D.W.V. July 21, 2010) (refusing to pierce corporate veil and dismissing Qarmat Ali case for lack of personal jurisdiction); and *Gallaher v. KBR*, 2010 WL 2901626  (N.D.W.V. July 21, 2010) (same).

For the reasons stated, the MOTION OF KBR, INC., OVERSEAS ADMINISTRATION SERVICES, LTD., AND SERVICE EMPLOYEES INTERNATIONAL, INC. TO DISMISS AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION (Document No. 13) will be **GRANTED**.


Motion to Dismiss for Failure to State a Claim

The Amended Complaint asserts claims for:  (1) negligence; (2) breach of contract - third-party beneficiary; (3) fraud/deceit/fraudulent concealment; and (4) intentional infliction of emotional distress.  The Defendants (for convenience "KBR") have raised numerous legal challenges to the Amended Complaint.  Defendants reiterate their contention that Bootay's claims are barred by the statute of limitations.  In addition, Defendants contend that: (1) the

negligence and contract claims must fail because Defendants owed no duty to warn an individual soldier, such as Bootay; (2) the fraud/deceit/fraudulent concealment claim must fail because the Complaint does not allege that Defendants made any misrepresentations to Bootay, and the allegations of fraud are not pled with particularity; and (3) the intentional infliction of emotional distress claim is based on the fraud claim, fails to allege intentional or reckless conduct, and fails to allege extreme and outrageous conduct.

### 1.     Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the complaint filed by Plaintiff.  The United States Supreme Court has held that "[a] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (207) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff.  However, as the Supreme Court made clear in *Twombly*, the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*  The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a <u>plausible</u> claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (emphasis added).

Thus, after *Iqbal*, a district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d

Cir. 2009).  First, the Court must separate the factual and legal elements of the claim.  *Id.*

Although the Court "must accept all of the complaint's well-pleaded facts as true, [it] may

disregard any legal conclusions."  *Id.* at 210-211.  Second, the Court "must then determine

whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible

claim for relief.'  In other words, a complaint must do more than allege the plaintiff's entitlement

to relief.  A complaint has to 'show' such an entitlement with its facts."  *Id.* at 211 (citing *Iqbal*

129 S. Ct. at 1949).  The determination for "plausibility" will be "'a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.'"  *Id.* at 211

(quoting *Iqbal* 129 S. Ct. at 1950).  As a result, "pleading standards have seemingly shifted from

simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more

than the possibility of relief to survive a motion to dismiss."  *Id.* at 211.  That is, "all civil

complaints must now set out 'sufficient factual matter' to show that the claim is facially

plausible.  This then 'allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged.'"  *Id.* at 210 (quoting *Iqbal*, 129 S. Ct. at 1948).  However,

nothing in *Twombly* or *Iqbal* changed the other pleading standards for a motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6) and the requirements of Fed. R. Civ. P. 8 must still be met.

*See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (internal citations omitted).

Fed. R. Civ. P. 8 requires a showing, rather than a blanket assertion, of entitlement to relief, and

"contemplates the statement of circumstances, occurrences, and events in support of the claim

presented and does not authorize a pleader's bare averment that he wants relief and is entitled to

it."  *Twombly*, 550 U.S. at 555 n.3 (internal citations and quotations omitted).  Additionally, the

Supreme Court did not abolish the Fed. R. Civ. P. 12(b)(6) requirement that "the facts must be

taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on those merits." *Phillips*, 515 F.3d at 231(citing *Twombly*, 550 U.S. at 553).

A motion to dismiss is primarily designed to evaluate the legal sufficiency of the complaint. However, in deciding a Rule 12(b)(6) motion, a court may also consider the exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents. *See, e.g., Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). In this case, both parties have submitted numerous exhibits, and the Court has reviewed these exhibits in its consideration of the jurisdictional challenge. Neither party has sought to convert the Rule 12(b)(6) motion into a motion for summary judgment and the Court declines to do so sua sponte. Accordingly, for the purpose of deciding the Rule 12(b)(6) motion, the record will be limited to the documents authorized by *White Consol. Indus.*, 998 F.2d at 1196. In particular, the Court will consider the unclassified version of the RIO Contract, as it is central to the claims in this case and its authenticity is undisputed.

2.      Legal Analysis

All parties assume that Pennsylvania law applies, as will the Court. The Court will address Defendants' contentions seriatim.

A.      Statute of Limitations

The allegations in the Amended Complaint differ substantially from those in the initial

10

Complaint regarding the extent of the injury suffered by Bootay while at Qarmat Ali and his awareness of that injury.    In the original Complaint, Bootay alleged that he was exposed to an orange powder throughout the facility, although he had no idea what it was, and that he suffered nose bleeds and skin lesions while at the Qarmat Ali facility.    The Court noted that the Complaint was inartfully drafted,[3] and concluded that it had failed to allege sufficient facts to toll the applicable statute of limitations.    Bootay now represents that he had no reason to believe that the orange powder was toxic and that he "had absolutely no knowledge that [he] suffered with any ailment as a result of my service at Qarmat Ali."    Bootay Declaration ¶ 15; Amended Complaint ¶ 50.    He avers that his nosebleeds were reasonably attributed to the desert environment. Immediately prior to his four day trip to Qarmat Ali in April 2003, Bootay had been in combat at the Baghdad Airport, in which an explosion occurred in his vicinity and he suffered a right knee injury and hearing impairment.    Report of Dr. Andrew Joseph, Bootay's treating physician. After leaving Qarmat Ali, Bootay moved on to other missions.    In July 2003, while in Fallujah, he suffered heat stroke with some paralysis on the left side of his body and loss of vision in his left eye.    These symptoms resolved within 24 hours.    However, at the time of the heatstroke Bootay also developed an inability to sweat and headaches that persisted through the time of his discharge from the military in September 2003.    Bootay developed flu-like symptoms and vomiting in 2005 and 2006.    Bootay was examined by numerous physicians upon his return to the United States, none of whom attributed his symptoms to sodium dichromate exposure.

The Court concludes that the Amended Complaint is sufficient to avoid dismissal on

---

[3]The Amended Complaint is not much better.  It is 63 pages long and contains 245 paragraphs, many of which focus on hearings conducted by the United States Senate Democratic Policy Committee rather than a "short and plain" statement of the grounds for Bootay's claims.

statute of limitations grounds. Bootay has now disavowed the existence of an injury while he was at Qarmat Ali and has disavowed any knowledge prior to 2009 of a causal connection between the alleged exposure to sodium dichromate and his injuries. Thus, taking these averments as true, Bootay did not possess the salient facts to trigger his duty to investigate the cause of his injuries. *See Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir. 1990). Indeed, with these averments, Plaintiff will face a difficult task to prove that the alleged exposure at Qarmat Ali is, in fact, the cause of his injuries. *See McManaway v. KBR*, 265 F.R.D. 384 (S.D. Ind. 2009) (ordering the plaintiff's expert to address how, in the absence of test results detecting sodium dichromate, a judge or jury could conclude that plaintiff's medical conditions were caused by exposure to sodium dichromate). In summary, the Court concludes that the Amended Complaint is not subject to dismissal as a matter of law as untimely. The Court turns now to Defendants' substantive challenges to the causes of actions asserted by Bootay.

B.     Negligence and Third-Party Beneficiary Claims

Plaintiff alleges that Defendants owed him a duty under two theories: (1) for failure to warn under Restatement (Second) of Torts § 324A; and (2) as a third-party beneficiary of the RIO Contract. Defendants argue that the tort and contract claims fail as a matter of law because they did not owe any duty to Bootay.

The basic facts affecting the "duty" analysis are fairly clear and undisputed. The sodium dichromate had been placed at Qarmat Ali by the Iraqi Baath Party to sabotage the facility. KBR was a private contractor who entered into an agreement with the military to support the Iraq War effort. KBR's primary objective at Qarmat Ali was to restart the Iraqi oil industry. Bootay was

an active-duty member of the United States Army.  Bootay was ordered, by the Army, to conduct

a mission at Qarmat Ali in April 2003.  Bootay was on active duty at Qarmat Ali for four days.

During that time, Bootay had no direct interactions with KBR or any of its employees.

The negligence theory articulated by Plaintiff is that Defendants failed to warn Bootay of

a known danger.  Pennsylvania has adopted § 324A, which states:

> Section 324A (Liability to third persons for negligent performance of undertaking)
>
> One who undertakes, gratuitously or for consideration, to render services to
> another which he should recognize as necessary for the protection of a third
> person or his things, is subject to liability to the third person for physical harm
> resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third persons upon
> the undertaking.

The existence of a duty is a question of law.  In deciding whether to impose a duty,

Pennsylvania has adopted a five-factor test: (1) the relationship between the parties; (2) the utility

of the defendant's conduct; (3) the nature and foreseeability of the risk in question; (4) the

consequences of imposing the duty; and (5) the overall public interest in the proposed solution.

*R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).

Applying Pennsylvania's five-factor test, the Court concludes that Defendants did not

owe a legally enforceable duty to Bootay.  There was <u>no</u> relationship between the parties.  They

were, literally, strangers.  The Court will assume that KBR employees mobilized at Qarmat Ali at

the same time as, or prior to, Bootay, but there was no interaction between the parties and their

activities were not coordinated in any way.  At most, KBR would have been aware that various

13

members of the United States military had been present at Qarmat Ali. However, KBR had no authority or role in directing the activities of the armed forces personnel such as Bootay while they were present at Qarmat Ali.

There is certainly social utility in informing persons who may have been exposed to environmental toxins. The Court has no difficulty in concluding that KBR should have promptly informed the <u>military</u> of the sodium dichromate contamination. The question in this case, though, is whether KBR had an enforceable duty to inform <u>individual service members</u> with whom KBR had no direct interaction.

The Court concludes that it was foreseeable that military personnel may have been exposed to sodium dichromate at Qarmat Ali and could suffer the types of injuries alleged by Bootay. The Court further recognizes the uniquely undetectable nature of sodium dichromate exposure. On the other hand, the nature of the risk was created by the Iraqis, not by KBR. Pennsylvania "Courts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances." *Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d 133, 139 (Pa. Super. 2006) (citations omitted). Such "special circumstances" do not exist here. KBR is not alleged to have increased the risk of sodium dichromate exposure; KBR did not undertake to protect military personnel from harm caused by the Iraqis; and Bootay does not allege that he suffered because he relied on KBR's assessment or failure to adequately assess the site. It was the Army, not KBR, who ordered Bootay to go to Qarmat Ali and who directed Bootay's activities while he was there.

The consequences of imposing a duty upon Defendants to inform individual service members (particularly those with whom they had no direct interaction) could prove far-reaching

and unwise.  Defendants certainly owed a duty to inform the military of that which they knew regarding the condition of the site, but that duty does not extend to individual service members. Such a duty would require a private contractor to intrude into the military's chain of command and communication to convey its warning message, and would require the military to divulge the identities of the various service personnel who may have been impacted and the dates of their possible exposures.  To impose a duty on KBR to warn  individual service members under these circumstances would interfere with the military's right to control its operations, to direct the activities of its personnel, and to maintain operational security, particularly in a time of war. Similarly, although the public undoubtedly has an interest in notifying soldiers of possible exposure to environmental toxins, that interest is distinctly outweighed  by the public interest in the military's ability to conduct a war.   Indeed, the military routinely exposes its soldiers to more direct and substantial dangers.

The Court of Appeals for the Third Circuit recently addressed a closely analogous situation in *Sheridan v. NGK Metals Corp., et al.*, 609 F.3d 239 (3d Cir. 2010).  In *Sheridan*, the Plaintiffs were employees or neighbors of Defendant NGK Metals Corporation, who alleged that they had been exposed to beryllium.  They claimed, pursuant to § 324A, that another of the Defendants, a company which had been hired to specifically monitor  the discharges of beryllium, had negligently failed to warn them of the harmful exposures to beryllium.  The Third Circuit Court of Appeals held that Plaintiffs had failed to state a valid claim because the monitoring company had not undertaken the responsibility to warn <u>Plaintiffs</u>, but had only undertaken the responsibility to report the monitoring results to the <u>owner/operator</u> of the facility. *Id.* at 263-64.  Thus, the Complaint failed to connect a specific duty owed to Plaintiffs with the

15

negligent performance of that duty. The Court of Appeals explained:

> For liability to be imposed under § 324A, "the defendant specifically [must have] undertaken to perform the task that [it] is charged with having performed negligently." *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir.1982). In other words, the defendant must have assumed an affirmative duty to be liable to third parties for negligently performing that duty. *See Evans v. Liberty Mut. Ins. Co.*, 398 F.2d 665, 667 (3d Cir.1968) ( "It is well-settled under Pennsylvania law ... that plaintiff must prove, inter alia, the existence of a duty owed to him and a breach thereof ....") (internal quotation marks and citation omitted). The scope of this rule, known as the "good samaritan doctrine," is measured by the scope of the defendant's undertaking. *Patentas*, 687 F.2d at 716. Even if a particular injury is foreseeable, *see Cantwell*, 483 A.2d at 1353-54 (stating that § 324A "is essentially a requirement of foreseeability"), a defendant must still have a specific duty to prevent the injury, *see Breiner v. C & P Home Builders, Inc.*, 536 F.2d 27, 31 (3d Cir.1976) ("Foreseeability of injury, however, in the absence of a duty to prevent that injury, is an insufficient basis on which to rest liability." (*citing Evans*, 398 F.2d at 667)).

*Id.* at 263.

The reasoning in *Sheridan* is applicable to this case. Defendants undertook no affirmative duty to protect Bootay from exposure to hazardous chemicals at Qarmat Ali, or to warn him of such exposure. Defendants had no specific duty to prevent Bootay's alleged exposure to sodium dichromate. Indeed, Defendants were unaware of Bootay's presence at Qarmat Ali. It was the Iraqis who created the sodium dichromate hazard and it was the Army who ordered Bootay to perform a duty mission at Qarmat Ali. *Accord Daraio v. Carey Canada, Inc.*, 309 F. Supp.2d 706 (E.D. Pa. 2004) (insurer who conducted studies at asbestos plant had no duty to warn employees). In sum, Defendants owed no "duty" under tort law to individual service members assigned to Qarmat Ali by the Army with whom they had no interaction.

Similarly, Plaintiff cannot establish a "duty" under a breach of contract/third-party beneficiary theory. Pennsylvania has adopted the Restatement (Second) of Contracts, § 302.

There is two-part test for determining whether one is an intended third party beneficiary: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Scarpitti v. Weborg*, 609 A.2d 147, 150 (Pa. 1992). The Court explained:

> a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, unless the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* at 150-51 (citations omitted).

KBR's primary objective was to restart the pumping of water from the Qarmat Ali facility into the Iraqi oil fields to help restore the Iraqi oil industry as quickly as possible after the invasion. The Court has reviewed an unclassified version of the applicable RIO Contract. The RIO Contract does not reflect any expression of intent to benefit individual soldiers. Nor do the circumstances of the situation indicate that individual soldiers were intended to benefit from KBR's performance of the contract. In relevant part, the RIO Contract provides that KBR was not to be deployed at the site until it was notified by the military that "benign conditions exist," which included the requirement that the facility had been cleared of "environmental hazards." The contractor was not to enter the facility before it had "been secured and cleared and declared benign." Rather, KBR personnel were to remain on stand-by in Kuwait until "benign conditions are established." Task Order 3; Section 1.1.1.

Under the RIO Contract, the Defendants acted as an independent contractor, with "exclusive supervisory authority and responsibility over [its own] employees." § 1.9. The RIO Contract contained a provision, § 1.13, regarding Environmental Protection, which provides, in relevant part:

> it is not the government's intention to remediate pre-existing sites (i.e., situations not caused by U.S. forces during hostilities, or by agents of the U.S. Government post-hostilities). General conditions for areas may be documented in United Nations reports published within the last five years. To document site-specific liabilities, initial assessments need to document (photographically, etc.) the condition of sites relative to pre-existing conditions. More detailed evaluation (e.g. analyses of samples of environmental media) may be pursued if visual evidence, likely site history (i.e., past use coupled with process knowledge), etc. warrant.. . . Environmental protection matters shall be coordinated with the [Procuring Contracting Officer] or designated representative and Commander responsible for the AO.

The RIO Contract further provided that any deviation from the general guideline "shall be at the direction of the theater commander." Nowhere in the RIO Contract did KBR undertake a duty to protect individual soldiers such as Bootay from pre-existing environmental contamination caused by the Iraqis. Similarly, the contract did not provide Defendants with any ability to control the activities of active-duty military personnel on-site.

Bootay points to the contractual provisions by which KBR had a duty to establish a safety program, conduct an environmental assessment and provide daily status reports. The RIO Contract, § 1.14.1, required the contractor to give each new employee a safety orientation and to institute a continuous training program "to make employees aware of existing hazards and all new hazards." Pursuant to § 1.14.2, the contractor was required to "IMMEDIATELY report" (emphasis in original) "any bodily injury which result in a lost-time accident . . . resulting from the activities of the Contractor, his agents, or employees." Section 2.2 required the Contractor to

"provide technical and operational support necessary to limit safety and environmental damage immediately following hostilities." Section 2.4.2.2 provided:

> Site assessment reports shall contain an environmental assessment documenting existing conditions and containing recommended remedial actions. The ACO shall concur prior to initiation of action, unless emergency conditions warrant immediate action. The plan shall indicate that it is not the intent of this contract to remediate pre-hostilities environmental contamination unless such remediation is necessary to protect the health and safety of contractor and Government personnel.

However, KBR's contractual duties were to its own employees and to the United States military, not to individual soldiers. Indeed, KBR had no right to communicate directly with individual soldiers such as Bootay, and the military had no obligation to inform KBR of the identity or whereabouts of individual soldiers. Nor could KBR exercise any management authority over individual soldiers. Such actions would have had obvious implications on the military's conduct of its war effort.

Bootay's reliance on Judge Nora Berry Fischer's opinion in *Harris v. KBR*, 618 F. Supp.2d 400 (W.D. Pa. 2009), is misplaced. In *Harris*, Judge Fischer concluded (correctly) that Plaintiff stated a valid claim by alleging that KBR had negligently failed to repair defective wiring on a military base in Iraq which resulted in a soldier being electrocuted while taking a shower.[4] The applicable contract obligated KBR to repair such problems. By stark contrast, the alleged harm to Bootay (sodium dichromate) was caused by the Iraqis, not by KBR – just as in *Sheridan*, the alleged harm was caused by the beryllium plant emissions, not the monitoring company.

---

[4]Judge Fischer also rejected KBR's argument that the case presented a non-justiciable political question, an argument that KBR has not raised in this case.

In summary, Bootay's negligence and breach of contract/third-party beneficiary claims fail as a matter of law. Defendants owed no duty to warn individual soldiers, with whom they had no interaction, of alleged environmental hazards caused by the Iraqis.


C.      Fraud-Related and Intentional Infliction of Mental Distress Claims

Pursuant to Fed. R. Civ. P. 9, allegations of fraud must be pleaded "with particularity." The Amended Complaint fails in this regard. Under Pennsylvania law, one of the essential elements of a fraud, deceit or fraudulent concealment claim is a "misrepresentation" to the Plaintiff *Ross v. Foremost Ins. Co.*, 998 A.2d 648, 654 (Pa. Super. 2010). Bootay has not alleged a cognizable "misrepresentation." Indeed, the Amended Complaint fails to allege that there were any communications, of any kind, between Bootay and Defendants. There is no averment that KBR had any knowledge that Bootay had been present at the Qarmat Ali site. Paragraph 220 states that Defendants misrepresented the site conditions "to the United States Army." *See also* ¶ 225 ("Defendants intended to deceive the United States Army, and ultimately the Plaintiff"). Alleged misrepresentations made to <u>other</u> individuals cannot take the place of allegations in the pending Amended Complaint which constitute fraud against Bootay. *Hemispherx Biopharma, Inc. v. Asensio*, 1999 WL 144109 *10 (E.D. Pa. 1999) (allegation that others acted in reliance on misrepresentations and that Plaintiff suffered loss as a result is not sufficient to state a claim for fraud).

Because the Intentional Infliction of Emotional Distress claim is premised on Defendants' alleged fraud, it also must fail. The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3)

severe emotional distress to another. *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. 2010). The Amended Complaint has not alleged that Defendants intentionally or recklessly caused Bootay to suffer emotional distress – the Amended Complaint has not even averred that Defendants knew of his existence. It is not enough to aver that Defendants' alleged coverup of the sodium dichromate contamination would prevent some unknown individuals from being tested for such exposure. It bears repeating that the Iraqis, not KBR, created the sodium dichromate contamination, and the Army, not KBR, ordered Bootay to perform a mission at Qarmat Ali.

In accordance with the foregoing, the MOTION OF KELLOGG BROWN & ROOT SERVICES, INC. AND KBR TECHNICAL SERVICES, INC. TO DISMISS PLAINTIFF'S AMENDED COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) (Document No. 15) will be **GRANTED**.[5]

Leave to Amend

Although the original Complaint in this case was dismissed on statute of limitations and personal jurisdiction grounds, the Court noted that Defendants had raised additional legal challenges that appeared to have merit and stated: "If Bootay chooses to file an amended complaint, it will be important to address these alleged shortcomings as well, to assure that the amended complaint contains sufficient factual allegations to render the claim(s) "plausible" in compliance with the pleading standard set forth in *Twombly* and *Phillips*." For the reasons set

---

[5]Assuming, arguendo, that the Court were able to exercise personal jurisdiction over the Jurisdictional Movants, the Amended Complaint would be dismissed, in any event, for failure to state a cognizable claim.

forth above, the Court concludes that the Amended Complaint has failed to state a claim upon which relief may be granted.  Further, the Court concludes that further attempts to amend the complaint would be inequitable and/or futile.  Accordingly, the Court will not grant leave to further amend and the Amended Complaint will  be dismissed with prejudice.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GLEN BOOTAY,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **2:09-cv-1241** |
| | ) |
| **KBR, INC.; KELLOGG, BROWN &** | ) |
| **ROOT SERVICES, INC.; KBR** | ) |
| **TECHNICAL SERVICES, INC.;** | ) |
| **OVERSEAS ADMINISTRATION** | |
| **SERVICES, LTD.; and SERVICES** | |
| **EMPLOYEES INTERNATIONAL, INC.,** | |
| **Defendants.** | |

**ORDER OF COURT**

AND NOW, this 9th day of September, 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that the MOTION

OF KBR, INC., OVERSEAS ADMINISTRATION SERVICES, LTD., AND SERVICE

EMPLOYEES INTERNATIONAL, INC. TO DISMISS AMENDED COMPLAINT FOR LACK

OF PERSONAL JURISDICTION (Document No. 33) is **GRANTED**; and the MOTION OF

KELLOGG BROWN & ROOT SERVICES, INC. AND KBR TECHNICAL SERVICES, INC.

TO DISMISS PLAINTIFF'S AMENDED COMPLAINT UNDER FEDERAL RULE OF CIVIL

PROCEDURE 12(b)(6) (Document No. 35) is **GRANTED**.

The clerk shall docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

23

cc:      Fred C. Jug , Jr., Esquire
Email: fredjug@covad.net

Joseph L. Luciana , III, Esquire

Email: jluciana@dfllegal.com

John R. Dingess, Esquire

Email: jdingess@dfllegal.com

William Wickard, Esquire

Email: william.wickard@klgates.com